Good afternoon, and may it please the Court. Lauren Ice on behalf of Plaintiff's Appellants. Your Honors, this is a case that involves a permitting decision by the U.S. Army Corps of Engineers to grant a 404 permit to the Moda Oil Terminal, now called the Enbridge Oil Terminal. I'd like to focus today on Plaintiff's main arguments on appeal, and those are that the Corps violated NEPA when they failed to consider the indirect and cumulative impacts of vessel traffic in their environmental assessment. I'd also like to address the argument that the Corps' failure to assess the impacts and the benefits coextensively in their environmental assessment was also a violation of NEPA. But quickly, I will first dispose of a couple of the forfeiture arguments that have been raised by the appellees. Briefly, Enbridge's argument that the appellants have waived their right to arguments over vessel traffic by not raising those in comments below, this is simply wrong. In our initial brief, we did cite two comments in the record on page 403 to 405, including some attachments. Those were submitted on March 6th, well before the comment deadline, and they did include mention of large passing vessels and ships being brought closer to the IOB community next door. And, of course, they were raised in the context of water quality, erosion, turbidity, light air, and noise pollution. But Enbridge argues, even if these comments are timely, that we've still waived the right to bring comments about vessel traffic because we did not use the magic words and raise it in context of vessel increases specifically. Counsel, are there any arguments you're making that are not related to the vessel traffic comments? Well, I do want to address the fact that the forfeiture arguments do hinge on the vessel traffic not being within the jurisdiction of the Corps, so I do want to talk, I think, related to the vessel traffic about how the Court and the Corps have improperly applied the rules that talk about when the Corps can expand its jurisdiction from the waters of the U.S. to others. I guess what I'm asking is, since you brought up and confronted the forfeiture argument up front, if we were to disagree with you, have you arguments that are not contingent on the vessel traffic that would survive that position? There are two ways to answer that question, yes. First of all, Enbridge did not argue below that we forfeited arguments related to vessel traffic impacts on seagrasses, so that issue is preserved just by the fact that they forfeited the forfeiture there. The second way to answer that question is that part of the Court's decision below hinged on the fact that the Court found that the jurisdiction of the Corps was limited to just the construction and the dredging, and so they would not have had any way to have been on notice that the vessel traffic was a concern, even though they may have been raised in comments because it was something outside of their jurisdiction. That ultimately was decided on that issue, and so if you find that vessel traffic is within the Corps' jurisdiction, then that alone would cure the forfeiture argument. The other forfeiture argument I want to address is the one in which the Corps and Enbridge repeatedly attempt to recharacterize our arguments about impacts as being about the Corps' scoping decision when there was nothing in the record that indicates what exactly the quote-unquote scoping decision is, and in fact, even the notice to commenters did not use the word scope. The EA includes what is called the scope of analysis, and that is something that we do not disagree with or argue against, because it is in the scope of analysis that the EA actually defines the geographic area within which the Corps is responsible for evaluating the effects of the activities, and it says directly that the direct and indirect and cumulative effects of the activities within this geographic scope will be considered, and so we take that statement to be the truth, and that is the basis of a large part of our  Is that consistent with the regulations? I'm sorry, Judge? Is that consistent with the regulations? Yes, that is both consistent with the NEPA's regulations and the definitions of indirect and cumulative impacts and the Corps' definitions under the Clean Water Act. Well, I took the scoping to be the Corps' definition of the activity that they were permitting. They do identify activity within that geographic scope. Because it's dredging and moving sand and all that business, and then creating a couple buoys, barriers here and there during the construction progress, right? Right. That's correct. The geographic scope absolutely, and there's no dispute about this, includes the construction of a new deep water dock that would have two new berths in addition to two additional berths. There would be four new berths as part of this construction for new deep water vessels. It includes the expansion of the West Basin, 85 feet closer to where our client's property is, and it includes adding that 1,700-foot turning basin to allow these ships access to the Corpus Christi Ship Channel. So it defines the geographic scope there, but what is important is the way that the HIPAA regulations then define what are the direct impacts, which we agree that the construction and the dredging activity are absolutely the direct impacts, which are defined as the impacts that occur at the time and in the same place as the activity. But then they have to also consider the indirect impacts, and the indirect impacts are those that happen later in time and may be farther removed, but are still caused by the activity and are reasonably foreseeable. And that's the test that we're applying here and the one that the court has failed to apply when looking at the indirect impacts. The Atchafalaya Basin Keeper case control, the cumulative impacts in this case, is that our guideline? Did you say the Atchafalaya Basin Keeper case? Yes. That's the case that the court relied on, but we're relying on the case, the circuit case that's come out since then, the O'Reilly case, which actually clarified that the holding in the Atchafalaya Basin Keeper case only applied to situations where there was no incremental impact whatsoever. So in that case, it relieved the court from the obligation to do a further cumulative impacts assessment because there wouldn't have been anything cumulative to add to if there was no incremental impact. Here though, REA does not say that there will be no incremental impact. It says that there will be some incremental impact, and for that reason, they are not excused from performing a full-fledged cumulative impacts assessment, and that becomes even more clear when you consider that they did not consider vessel impacts even in their cumulative impacts assessment. So if you add vessel impacts to that, then there are absolutely going to be impacts that are not mitigated, and that was something that they looked at, and O'Reilly actually was not just whether or not the wetlands that were being destroyed. But O'Reilly is, quote, unpublished, but it's also non-precedential. You're right, and I am citing it because it is, I think, there are so few cases that actually touch on this exact fact pattern that we have here, that it is one that helps the court and the parties to identify . . . Well, what's the real difference between this and Atchafalaya? Well, in Atchafalaya Basin Keeper, they were looking at a larger project and were trying to decide whether or not that project . . . they had to consider the cumulative impacts of the project. We moved on from talking about indirect impacts, just so you know, so the cumulative impacts are really the . . . they can be caused by other agencies, not just the core private entities, and they can be farther down the line and much more attenuated from the direct and the indirect impacts. So that case was really about cumulative impacts, and what the O'Reilly case said was that there were no incremental impacts identified there because they had all been mitigated. All of the impacts were going to be completely mitigated. And they were focusing . . . and in O'Reilly, what they were focusing on was that the light and the noise impacts were enough. There were operational impacts that played into this court's decision in that case. That could be enough to decide that the cumulative impacts assessment was required, because that's not something that's necessarily mitigated for. So . . . I'm sorry. What about Sigler? Does that still govern the EA analysis? Yes. Sigler is still good law. There are . . . there is some discussion in there that is not about the worst case scenario, but it is the case that from this circuit that is absolutely the most similar to our fact pattern. It's very distinct from the other cases that the core and Enbridge rely on, which I will talk about in a minute, but yeah, it's the most similar facts, and it's also the most similar questions of law that were asked of the court. It involved a dredging project, and it also involved bulk cargo activities, which were oil tanker activities. The environmental document in that case looked only at the impacts from the dredging and construction, just like we have in this case, but the environmental document also bragged about the broader benefits of that, the oil tanker activity, like growth, like the economic efficiency, using larger ships to move more product at one time. We have a lot of the same similar benefits being touted in this case, but what the court said in that case was that once NEPA is triggered, it cannot be used to skew the benefits in favor of the project. It can't be used to skew the benefits in either direction, and so that is what applies actually to the requirement that is mandated by NEPA and that is in the core's NEPA regulations that says they have to consider the benefits and the detriments coextensive to one another. They have to consider those within the same scope, and so what Sigler stands for is that that was a NEPA analysis where they did not do that. They did a separate clean water action analysis, and they found that the NEPA analysis failed because it skewed the favor and the benefits of the project by not considering the detriments of the same benefits that it touted. So that part is still good law, and I think that case also is informative. Even though they didn't reach the question of indirect and cumulative impacts in that case, there would have been no doubt that if you were going to include the impacts in the analysis weighing evenly the benefits and the detriments, that those would also have been impacts that would have had to have been included in at least the cumulative impacts if not also in the indirect impacts, so that case got remanded back, and that's what we're going to have to do is follow the pattern that was set in Sigler since this is such a factually similar and procedurally similar case as that to vacate the decision because there was a failure, or the permit, because there was a wholesale failure to consider an entire category of impacts. What categories of impacts were not considered? So the impacts related to the vessel traffic in the course jurisdiction. You already forfeited that. We did not . . . I respectfully disagree that we did not forfeit that argument because we did raise it during the comments and it was raised, I will say . . . Well, Judge Tipton seems to think that you only raised it in offhand sort of indirect. Well, I think what the argument was below was, like I said, what Enbridge was saying. You didn't brief it on appeal, that was the other thing. I mean, after they squarely put front and center, Judge Tipton did, and then your appeal didn't say anything about forfeiture. You treated it as if there had been nothing in the underlying district court opinion about it. Well, I can . . . I think what we briefed were our claims that were the substantive claims that the forfeiture decision turned on, and so we did preserve what our claims were in that way because, as I said . . . Well, suppose one of your arguments would have . . . suppose you were going to say that shorebirds would be discouraged by the turbidity of the water turned up by the dredging. I mean, could you have brought that up in your appellate brief, even though you never squarely raised it in your comments or in the . . . and the district court had said, I find that's forfeited? Well, what was raised in the comments was that there was a concern about vessel traffic becoming closer to the IOB community, and to be very clear, there is not . . . the dredge project is in order to dredge to a depth that would allow those boats to travel in that area, so there is not any boat traffic that are these large vessels in that area at the time. So just because we did not raise or a commenter did not say that we are preserving the issue of increased vessels, it is inherent because there are zero vessels there now, so the fact that any vessels would be traveling there would be an increase in vessels. These are commenters who, as I've mentioned, were making comments in response to a notice. There was not a public . . . there was not a scoping process here, as one of the courts would suggest. Well, and what have you said specifically about seagrasses? That was an issue that we have briefed on related to the turbidity and water quality concerns and the proximity of the dredging basin. This goes to the extent of the Corps' impacts consideration that central to their decision in granting this permit is to identify the location, the depth, the proximity to those seagrasses of where the dredge basin will be, and that turbidity from that has been something that the Corps has been well aware of in the comments below, and that, again, that issue at the lower court turned on whether or not they would have been aware of that when it wasn't something within their jurisdiction, so . . . Well, I thought the company had agreed to plant X number of acres of seagrasses. They have, and the mitigation . . . And the Corps took that into account, did it not? The mitigation that's being offered, the planting of seagrasses, is for the direct loss of seagrasses that will be dredged. There was no consideration, and I think that the parties will all agree that there was no consideration of impacts of vessel traffic on seagrasses. It was limited simply to the dredging and the construction, the temporary impacts that would go away. So they are removing seagrasses by dredging, and they are mitigating for those, but the comments and the briefing shows that there is going to be ongoing turbidity issues from the vessel traffic, and that those are the indirect and cumulative concerns that were not included in the EA whatsoever. That was the category of information that was left out. So I see that my time is up. I will reserve the rest of my time for rebuttal. Thank you. Thank you. Thank you. All right. Ms. Jeffries. Good afternoon. May it please the Court. Ariel Jeffries on behalf of the Army Corps of Engineers. We talked about a number of attenuated effects today, so I just want to take a step back before I begin to talk about what this permit is actually about. Enbridge, the intervener here, owns a marine terminal, and when it wanted to expand its docks, it applied to the Army Corps of Engineers for a permit that was necessarily only for the limited purpose of dredging and construction in the waters of the United States. The Corps, in issuing that permit, considered whether it was in the public interest under the Clean Water Act, and also considered whether there would be any significant environmental effects of the proposed dredging and construction as required by the National Environmental Policy Act. As the district concluded in a thorough opinion, the Corps' analysis was eminently reasonable, and this Court should affirm. I'd like to talk about three different things today. First, I'd like to briefly touch on the Corps' scoping decision. Then I'd like to discuss the Corps' evaluation of direct, indirect, and cumulative effects within that scope. And then third, I'll turn to, and the majority of my presentation will be on plaintiff's argument that the Corps was obliged to consider additional indirect and cumulative effects that flow from potential future terminal operations and vessel traffic. First on the Corps' scoping of its environmental review, I just wanted to clear a couple of things up. As plaintiffs concede in their reply, they have not challenged the Corps' scoping determination, and by the Corps' scoping determination, I mean the Corps' application of its Appendix B NEPA regulations, which direct the Corps to assess only the effects of the specific activity that requires a Corps permit, and those portions of the entire project over which the Corps has sufficient control and responsibility to warrant federal review. The Corps applied those regulations in its environmental assessment and reasonably concluded that the scope of its NEPA review included only the dredging and construction activities requiring a permit, not the operation of the terminal or resulting vessel traffic or any other effects that the Corps lacked control and responsibility over. As the District Court held, the Corps' scoping decision properly applied its regulations and reasonably then defined the scope of direct, indirect, and cumulative effects that the Corps considered. Plaintiffs' failure to challenge that scoping decision in District Court in their concession and reply that they do not challenge the Corps' scoping alone can resolve this case because, as the District Court explained, the Corps' scoping reasonably set the outer bounds of the impacts that the Corps considered to exclude the terminal operation effects that plaintiffs present here today. So second, within that set scope, the Corps reasonably considered all direct, indirect, and cumulative effects. The terminal and the upland facility here already exist and are operational, and this permit is a minor amendment which authorizes about 43 acres of dredging of a bay bottom. It permits construction to extend the dock and create additional mooring structures, and the Corps reasonably concluded that those activities will simply not have significant environmental effects. First, looking at dredging, dredging of about 40 acres of bay bottom will not have significant environmental effects, particularly in an already developed area. The Corps considered temporary turbidity, sedimentation in the water from the dredging, as well as any effects on animals and vegetation in that area, and the Corps looked at the effects on 9 acres of seagrasses that grow on the bay bottom and would be affected by dredging. As to the effects of the fill of the bulkhead extension, the Corps considered the effects to under an acre of wetlands that would be affected both directly filled and because of severed hydrology when the bulkhead was constructed, and likewise, the Corps did not consider those effects to be significant. The Corps also considered cumulative effects by considering specific past, present, and reasonably foreseeable future projects in the area, and reasonably concluded that any incremental environmental effects caused by the permitted activity would not create a cumulatively significant environmental effect with other projects. And finally, the Corps required the applicant to minimize and mitigate any environmental effects of the project. I'll touch on only a couple of those here as relevant. For mitigation for the 9 acres of the seagrasses, the applicant agreed to plant 20 new acres of seagrasses and is constructing a 2,000 foot breakwater in order to protect seagrasses from waves and to protect wetland habitats that are past that breakwater, and in order to mitigate the effect of about an acre of the wetlands that will be affected, the applicant is preserving in perpetuity a 70 acre wetland forest. Thus, the Corps ultimately determined that with the mitigation, the proposed dredging and construction would lead to no net loss of aquatic resources. The Corps' consideration of indirect and cumulative effects fully complied with NEPA and the Clean Water Act. Still, plaintiffs argue that the Corps should have additionally considered not only the effects of the specific federal action here, here the permit for the specific dredging and construction activities, but also downstream private operations and the effects flowing from vessel traffic to and from the terminal. As a threshold matter as already discussed this morning, plaintiffs forfeited vessel traffic arguments. That was an independently dispositive holding of the district court. Who regulates vessel traffic? How do we get a handle on that? So vessel traffic is regulated by the Coast Guard. The Coast Guard dictates the amount of ships that are coming in and out and the pathways that they're going to be following. My understanding, and it may be the intervener counsel has a better understanding of the process for his client. Is that what dictates what the Corps has to consider? The fact that... The Coast Guard's idea of what the vessel traffic will be after the project, is that what the Corps considers? Or does the Corps have another metric that it uses to determine, well, vessel traffic may be A as opposed to B? The Corps, through its scoping evaluation, determined that it only considers the effects of the specific activity requiring a permit. So here, the 40 acres of dredging, the construction, questions that are further attenuated from that, such as how many vessels are going to be coming and going, frankly, are set by market forces, private decisions, and to the extent that there's any sorts of safety issues, they would be regulated by the Coast Guard. That's simply not within the ballywick of the Army Corps of Engineers, which under the Clean Water Act and Rivers and Harbors Act is really looking specifically at these effects to the navigable capacity of waters under the Rivers and Harbors Act, or for the Clean Water Act, to make sure that the chemical, physical, and biological integrity of these waters are intact. It's simply not within the scope, and the Corps was not required to consider these kinds of operational effects, both because of its scoping process, as I've already discussed, but also separately, just because of black letter NEPA law. As the Supreme Court has recognized repeatedly in Metropolitan Edison, in Public Citizen, NEPA permits agencies to draw manageable, context-specific lines in determining the scope of environmental review. Agencies need not consider effects that are too attenuated, or importantly here, that are simply not sufficiently material to the agency's decision-making process. And that's because agency consideration of those kinds of effects are simply not likely to serve NEPA's purpose, or to ensure that government agencies are considering these significant environmental effects of their actions before making a decision. Nor would it satisfy NEPA's rule of reason, which ensures that agencies determine whether and to what extent to prepare an environmental impact statement. Even if an environmental harm is reasonably foreseeable in the abstract, NEPA also embodies a causation requirement, which is not met if the agency has no ability to prevent the harm identified due to its limited statutory authority over the relevant actions. And here, the vessel traffic effects are simply not reasonably closely related to the Corps' decision to permit dredging and construction. The Corps is not permitting vessel traffic, or any additional throughput of crude oil, or any operations of the terminal or its upland facilities. How did they raise the question of vessel traffic in comments? There are a few, as they raise for the first time in reply, scattered references to vessel traffic in relation to the vessels becoming closer to the nearby communities, and the noise and light effects of that. That's right. The noise. Yeah, but the references to that are extraordinarily scattered, and I think, importantly, for the purposes of forfeiture, this Court doesn't even need to dig into the entirety of the record and look to the comments, because the issue is twice forfeited. They did not raise, plaintiffs did not raise in their opening brief, any argument against the independently dispositive decision of the District Court below that they had forfeited those issues, and the District Court additionally determined that they had essentially conceded that they had not raised those issues sufficiently in the comment period. That is simply enough, and to judge Engelhardt's question earlier, to plaintiffs, my understanding is that their theory today, both on parity and on indirect and cumulative effects, is entirely hinged on the notion that the Corps needed to consider additional vessel traffics, and so a forfeiture decision either on the question of procedural forfeiture and administrative exhaustion as the District Court raised, or simply on the fact that they did not raise an attack on an independently dispositive holding of the District Court in their opening brief could resolve this issue here. In conclusion, the Corps took a required look at the environmental impacts within the scope of its action. Its analysis considered all relevant factors and was fully compliant with NEPA and the Clean Water Act. We respectfully ask the Court to affirm the District Court decision upholding the Corps permit. Thank you. All right. Thank you very much. Mr. Marwell. Good afternoon, Your Honor. Jeremy Marwell for Enbridge Ingleside Oil Terminal. I know it's been a long afternoon, so two quick points on scoping indirect impacts, and then one on cumulative impacts. If I might, the Corps reasonably complied with NEPA and the Clean Water Act while recognizing and respecting the limited scope of its statutory authority. So the first point on indirect impacts is forfeiture. The District Court held as one of two independent bases for its judgment that the plaintiffs had not administratively exhausted claims about vessel traffic, and under the normal rules of appellate procedure, the plaintiffs had the burden to challenge that in their opening brief. If they did not, you could end the analysis there, I think, that the crux of their arguments on appeal is about vessel traffic. And I think that is fair, also, because while there might be scattered references here and there, you have a 1,600-page administrative record. We're now four years into this process, and I think you have to look really hard in comments to find what has become the centerpiece of the appeal on vessel traffic. If you were to reach the merits of the—either if you view it as a scoping question or as an indirect impacts, I think under the Supreme Court's public citizen case, the Corps is not the legally relevant cause of potential increases in vessel traffic. Partly, that is because the Coast Guard, a different federal agency, regulates vessel traffic, and there are citations to those regulations in the briefs, but also because we have a state agency, Texas, which regulates throughput at the terminal by virtue of an air permit. And so what the Supreme Court has said in public citizen is that at some point the causal chain is too tenuous. We have potential environmental impacts here that might follow from an increase in vessel traffic that are just too tenuous. As to cumulative impacts, we think FAF and Atchafalaya got it right. We think they can be read by their terms. O'Reilly—the second O'Reilly decision, which postdates the district court's decision in this case, I think is easily distinguishable because even if you were to apply that standard, the Corps did more—far more than what was found insufficient in that case. But I would urge you to apply the plain language of what the Court said in FAF and Atchafalaya, which is that there's a rule of reason that has to apply to cumulative impacts. The agency gets some ability to craft an analysis particular to the circumstances, and here the agency exhaustively analyzed why there were not significant impacts that could accumulate in the way that might have been a concern. We appreciate the Court's attention. This is a very important project to Enbridge and its customers, and we urge the Court to affirm. If there are no further questions, I'll yield the remainder of my time. Okay. Thank you. Thank you, Your Honor. Ms. Ice? Thank you, and may it please the Court. I would like to start by addressing the Corps' arguments regarding the scoping process. Just to be very clear, there was no scoping process that was subject to public comment. The word scope was not used in the notice that alerted people that there was an opportunity to comment, and the EA was prepared after the public comment period closed. So there was no scoping process that anyone was on notice of, and the District Court did find that we raised the issues through challenges to the impacts, so I'll let it stand at that. The Corps also calls the vessel traffic too attenuated to be considered, even though it is the primary purpose of the project is to allow for vessels to dock at this particular location. The notice itself includes schematics that Enbridge provided. In those schematics are no dredgers, but there are pictures of vessels docking at those docks and in those locations. And they mention also that the comments were scattered below, and by doing so, I think they really admit that there were comments on vessel traffic, and there were concerns that the Corps was aware of that vessel traffic was going to have impacts on the neighboring community and the environment. What do you say about the Supreme Court case that says that the agencies are supposed to look at these environmental requirements in regard to the activity they regulate? Well, I would say that the... In this case, it's dredging and booms and that kind of thing, breakwaters. The cases that are relied on here to the public citizen case that says that we're going to look at the impacts that the agency has the ability to control or has the control of the outcome, I would distinguish that case from the facts at hand. In that case, the agency had no discretion. It did not matter what action the agency took. It would not have changed their ability to regulate the traffic flow in that situation. And so this rule of reason that opposing counsel mentioned actually was cited in that case because what they found was it didn't matter if they considered the information related to traffic. It would not have affected their decision one way or another, and therefore, that was not reasonable to require them to consider that information. Here, it's totally different. The court is obligated to consider the impacts on the aquatic environment from the activities that they permit, and their permit does cover the depth of the dredge. It covers the scope of the dredge, as I mentioned earlier. It covers the location of the dredge, any of those decisions that they can change based on the information they consider. And the vessel impacts certainly could impact the decision. Maybe they don't want to permit it so close to the seagrass beds or to the shoreline or to the community. And so that is certainly a decision that they can make. And just because other agencies have authority to regulate the traffic in that area does not mean that the Army Corps does not have jurisdiction to consider it as an impact in their NEPA process. What's your best case for saying that? Well, I would point to actually the way that we can distinguish between the cases that . . . You can distinguish what's your best case holding what you want us to hold, that the Army Corps should have considered some direct or indirect or cumulative impacts of vessel traffic after the project is completed. Well, I would point to Sigler then to show that it's . . . I mean, that was 1983, wasn't it? Yes, that's right. It was 1983. Have the rules changed a little since then? They have, but not the rules that they were relying on in terms of doing their cost . . . what is the cost or the detriment to benefit comparison? That is still good law, and I do want to go back and amend my answer to Judge Engelhard's question earlier just to be very clear. It is not just about vessel traffic because when we're looking at the NEPA requirement to compare the same scope of detriments to the same benefits so that it's not . . . so it applies, of course, to vessel traffic, but it applies to the benefits that they've claimed here, too, and those benefits are things like increased navigability and increased production of petroleum. I think the Corps and Enbridge have agreed in their brief that the EA does not conduct a NEPA analysis. They only conduct a Clean Water Act analysis, and it is required under NEPA. It's required under the statute, and it's required under Appendix B in the Corps' rules that they perform this coextensive benefit to detriment analysis, and so the fact that they have not done that is a violation of NEPA on its own because it has skewed this decision in favor of the project, and so that is why we would ask that you vacate the permit and remand it back to the agency that they can consider that and perform a proper NEPA analysis. Okay. Thank you very much. Thank you. We will stand in recess this afternoon until 9 a.m. tomorrow morning.